**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
---------------------------------------------------------------------------X
PAUL CRAIG WORRALL,

                *Plaintiff*,

    -against-

RIVER SHACK LLC d/b/a WOODSHED
SMOKEHOUSE and LOVE STYLE, INC.

                *Defendants*.
---------------------------------------------------------------------------X

**3:22-cv-392**

**COMPLAINT**

**JURY REQUESTED**

Plaintiff Paul Craig Worrall ("Plaintiff" or "Mr. Worrall"), by his counsel, The Harman Firm, LLP, alleges for his Complaint against Defendants River Shack d/b/a Woodshed Smokehouse (herein referred to as "River Shack") and Love Style, Inc. (collectively, "Defendants"), as follows:

## NATURE OF THE ACTION

1.  Plaintiff seeks damages and costs against Defendants for discriminating against him on the grounds that he was associated with someone who was disabled, and/or would have been a caregiver, within the confines of the Americans with Disabilities Act ("ADA"). 42 U.S.C. Sec. 12101 *et seq.*

2.  Plaintiff seeks damages and costs against Defendants for discriminating against him on the grounds that he was disabled within the meaning of the ADA. 42 U.S.C. Sec. 12101 *et seq.*

3.  Plaintiff seeks damages and costs against Defendants for discriminating against him on the grounds that he was associated with someone who was disabled, and/or would have been a caregiver, within the confines of Chapter 21 of the Texas Labor Code ("TLC").

1

4. Plaintiff seeks damages and costs against Defendants for discriminating against him on the grounds that he was disabled within the confines of Chapter 21 of the TLC.

## PARTIES

5. At all times relevant hereto, Plaintiff was and is a resident of Dallas County in the State of Texas.

6. Upon information and belief, at all times relevant hereto, Defendant River Shack was and is an incorporated company organized under the laws of the State of Texas with its principal place of business at 3201 Riverfront Drive, Fort Worth, Texas.

7. Upon information and belief, at all times relevant hereto, Defendant Love Style's headquarters is located at 713 N Main St, Fort Worth, Texas 76164, and it is organized under the laws of the State of Texas.

## ADMINISTRATIVE PREREQUISITE

8. Plaintiff received a Right to Sue letter from the Equal Employment Opportunity Commission on January 6, 2022 and filed this action within the ninety (90) day period.

## JURISDICTION

9. Pursuant to 28 U.S.C. § 1331, this Court has original jurisdiction over Plaintiff's claims, as they arise under the ADA, 42 U.S.C. § 12101, *et seq*.

10. Pursuant to 28 U.S.C. § 1367, this Court has original jurisdiction over Plaintiff's State claims because they are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy.

## JURY TRIAL REQUESTED

11. Plaintiff respectfully requests a trial by jury.

## STATEMENT OF FACTS

12. In 2020, Director of Operations, Bill Curcie, recruited Mr. Worrall to work at River Shack.

13. Mr. Curcie eventually hired Mr. Worrall at River Shack on September 9, 2020 as a Restaurant Manager.

14. On January 22, 2021, Mr. Worrall received a text message from Human Resources agent Melinda Morgan asking how Mr. Worrall's wife was doing as she had heard from Terry Ward, Chief Operating Officer, that Mr. Worrall's wife had been exposed to COVID.

15. That same day, Ms. Morgan sent out an email to staff stating that anyone who tests positive for COVID and isolates themselves at home, would not receive pay. Neither Mr. Worrall nor his wife had contracted COVID.

16. In spite of the fact that Mr. Worrall had not contracted COVID, COVID sick pay was applied to his paycheck in January of 2021. Mr. Worrall did not receive time off from work in January 2021, when Defendants applied COVID sick pay to his paycheck.

17. Upon information and belief, River Shack sent the email threatening loss of pay knowing that Mr. Worrall may have to take time off work to operate as a caregiver within the confines of the ADA and the TLC.

18. Mr. Worrall had not, during this period, tested positive nor had he notified River Shack that he had tested positive for COVID.

19. Mr. Worrall only communicated that his wife was being tested for COVID, explaining that he may have to act as a caregiver.

20. On January 23, 2021, the day after the email, Mr. Worrall notified Ms. Morgan of his wife's negative test result and that he, therefore, had no need to test as well.

21. Ms. Morgan asked Mr. Worrall if he had missed any time from work during this process; Mr. Worrall denied that he had missed any work, as this had all taken place during his days off.

22. Mr. Worrall continued to work without incident until March 1, 2021, when Mr. Worrall informed Mr. Heisler that his family doctor wanted his wife to be tested again as he believed she had contracted COVID.

23. Mr. Heisler suggested Mr. Worrall get tested as well; Mr. Worrall agreed.

24. On or about March 1, 2021, Mr. Worrall learned that his wife was COVID positive. Mr. Worrall's wife was very ill with COVID symptoms and he had to stay home to care for her.

25. Defendants never made any attempt to engage in the interactive process with Mr. Worrall regarding his possible or his wife's actual disability despite the fact that Defendants were aware of Ms. Worrall's disability.

26. Two days later, March 3, Mr. Worrall asked Mr. Heisler to call him, as he also tested positive for COVID. The test and result came from the CVS Pharmacy (hereinafter "CVS").

27. Mr. Heisler told Mr. Worrall, now over the phone, that he was going "to bat" for Mr. Worrall to help him get paid for his now imminent sick leave.

28. The next day, March 4, Mr. Heisler called Mr. Worrall and said that the best he could do was 50% of 90% of Mr. Worrall's wage.[1]

29. On March 5, 2021, Mr. Worrall texted Ms. Morgan seeking clarification for River Shack's return policy, and inquired if he produced a negative test so that he would be cleared for a return to work, with full pay.

---

[1] Mr. Worrall has waived his right to receive his two weeks compensation for that sick pay, *see* Worrall, et al. v. Love, et al., 3:21-cv-02602-D, but did not waive his right to receive other damages available under the ADA, such as other lost pay, emotional distress, and attorney's fees, amongst other remedies the Court deems just and proper.

4

30. Ms. Morgan replied "yes," and, that same day, Mr. Worrall went to get tested again, this time at the Premier Wellness Clinic (hereinafter "Premier") and tested negative for COVID.

31. Mr. Worrall notified Mr. Heisler almost immediately that he would be back for work the next day. Mr. Worrall proceeded to work from March 6, 2021 through March 10, 2021 without incident.

32. On March 10, 2021, Mr. Worrall was notified by Mr. Heisler that he was needed in a meeting with Ms. Morgan and Mr. Ward.

33. Ms. Morgan and Mr. Ward requested that Mr. Worrall go to a CVS and get tested for a third time. Mr. Worrall proceeded to do so.

34. On March 11, 2021, around 11:00am, Mr. Worrall was tested for COVID at the Carrollton CVS. After receiving the March 11 test results from CVS on March 13, Mr. Worrall notified Mr. Heisler that he received a positive test.

35. Mr. Heisler responded "understood."

36. In all, Mr. Worrall had three relevant COVID tests; March 1, positive; March 5, negative; and March 11, positive.

37. Following his positive March 11 test, Mr. Worrall began to feel the effects of COVID-19, such as a lack of energy to perform daily tasks, and was instructed to not leave his home for fourteen (14) days.

38. For all three tests Mr. Worrall has evidence that the test was administered and signed by an attending physician or official.

39. The following morning, March 14, 2021, Mr. Heisler inquired about Mr. Worrall's wellbeing via phone call.

40. On that same call, Mr. Heisler notified Mr. Worrall of his termination from River Shack for "falsification of documents." Mr. Worrall never received anything in writing regarding his termination from River Shack.

41. Mr. Worrall then went to Premier to verify that Premier indeed had records of his test administered at that site. The clerk verified Mr. Worrall was tested at that clinic on March 5, 2021. Mr. Worrall asked the clerk to take photos of the records confirming his visit at Premier and had the clerk send those records to him.

42. Mr. Worrall had not falsified any document.

43. Rather, the tests failure to either render an accurate reading, or a coincidence of contracting COVID after March 5, 2021, but before March 11, 2021, led to a discrepancy in the tests results.

44. In either scenario, Mr. Worrall did not falsify any record of his COVID tests.

45. Mr. Worrall has a copy of the March 5, 2021 test which clearly notes that his status was "negative" and was signed by the Premier staff member on site.

46. Mr. Worrall did not falsify any documents, but, rather, River Shack chose to unjustly claim that Mr. Worrall lied about the test result as pretext to discriminate against him on the basis of disability.

47. Defendants were unwilling to give Mr. Worrall paid time away from work, even though Defendants had already claimed to the federal government that Mr. Worrall had received COVID sick pay. In other words, Defendants were unwilling to reasonably accommodate Mr. Worrall when they denied him paid time away from work.

48.    River Shack terminated Mr. Worrall on March 14, 2021 for a pretextual reason and that pretextual termination directly led to Mr. Worrall being unable to claim unemployment benefits.

## CLAIMS

### FIRST CLAIM
### Disability Discrimination in Violation of the Americans with Disabilities Act

49.    Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 48 with the same force as though separately alleged herein.

50.    The Americans Disabilities Act states that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to … discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. Sec. 12112(a).

51.    The ADA specifically notes that it prohibits employers from discriminating against employees who are in a relationship, or otherwise associated, with someone who is disabled.  42 U.S.C. Sec. 12112(b)(4).

52.    Defendants threatened to withhold Plaintiff's income if his wife tested positive for COVID.

53.    Defendants could have reasonably accommodated Plaintiff by giving him sick pay and time off and, thus, would not have subjected to the discrimination he faced in his caregiver status and association with a disabled person.

54.    Plaintiff had a negative employment action occur "on the basis of disability" because of his association to a sick family member, his wife.

55. Defendants' stated reason for termination is merely pretext and was shown to be untrue.

56. Plaintiff here meets the Fifth Circuits elements of a prima facie case for association discrimination; he was qualified for his job, he had an adverse employment action occur, the employer clearly and explicitly knew of the disabled relative, and the adverse employment action can be reasonably inferred to have occurred on the basis of that disability. *Grimes v. Wal-mart Stores Texas*, L.L.C., 505 Fed. Appx. 376, 380 (5th Circ. 2014).

57. As a direct and proximate consequence of Defendants' illegal termination, Plaintiff has suffered and continues to suffer, substantial economic and non-economic damages, including but not limited to, back pay, front pay, emotional distress and suffering, all in amounts to be determined at trial.

## SECOND CLAIM
**Disability Discrimination in Violation of the Americans with Disabilities Act**

58. Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 48 with the same force as though separately alleged herein.

59. The Americans Disabilities Act states that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to … discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. Sec. 12112(a).

60. Plaintiff had a positive COVID-19 test on March 11, rendering him unable to return to work for two weeks.

61. Plaintiff had COVID symptoms following this and was told by CVS officials that he had to quarantine for fourteen (14) days; stated differently, because he was positive with COVID-19, Plaintiff had his major life functions impaired.

62. Defendants were aware of this disability.

63. Defendants terminated Plaintiff immediately following his disclosure of his disability.

64. Defendants' stated reason for termination is merely pretext and proven to be untrue.

65. As a direct and proximate consequence of Defendants' illegal termination, Plaintiff has suffered and continues to suffer, substantial economic and non-economic damages, including but not limited to, back pay, front pay, emotional distress and suffering, all in amounts to be determined at trial.

## THIRD CLAIM
### Disability Association Discrimination in Violation of Texas Labor Code §21.051

66. Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 48 with the same force as though separately alleged herein.

67. §21.051 states "[a]n employer commits an unlawful employment practice if because of … disability … [the employer] discharges an individual, or discriminates in any other manner against an individual in connection with compensation or the terms, conditions, or privileges of employment."

68. Texas Courts have noted that they are guided by federal courts' interpretation of the ADA when interpreting Chapter 21 of the Texas Labor Code. *Thomann v. Lakes Regional MHMR Center*, 162 S.W.3d 788, 796 (Tex. App. – Dallas 2005).

69. Plaintiff can show a prime facie case that he was discriminated against "because of … disability."

70. Plaintiff faced an adverse employment action, but Defendants' stated reason for termination is merely pretext and was shown to be untrue.

9

71. As a direct and proximate consequence of Defendants' illegal termination, Plaintiff has suffered and continues to suffer, substantial economic and non-economic damages, including but not limited to, back pay, front pay, emotional distress and suffering, all in amounts to be determined at trial.

## FOURTH CLAIM
### Disability Discrimination in Violation of Texas Labor Code §21.051

72. Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 48 with the same force as though separately alleged herein.

73. §21.051 states "[a]n employer commits an unlawful employment practice if because of … disability … [the employer] discharges an individual, or discriminates in any other manner against an individual in connection with compensation or the terms, conditions, or privileges of employment."

74. Plaintiff had a positive COVID-19 test on March 11, rendering him unable to return to work for two weeks.

75. Plaintiff had a lack of energy following this and was told by CVS officials that he had to quarantine for fourteen (14) days; stated differently, because he was positive with COVID-19, Plaintiff had his major life functions impaired.

76. Defendants were aware of this disability.

77. Defendants terminated Plaintiff immediately following his disclosure of his disability.

78. Defendants' stated reason for termination is merely pretext and proven to be untrue.

79. As a direct and proximate consequence of Defendants' illegal termination, Plaintiff has suffered and continues to suffer, substantial economic and non-economic damages, including

but not limited to, back pay, front pay, emotional distress and suffering, all in amounts to be determined at trial.

## **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests the following relief:

1. For the First Cause of Action, compensatory and punitive damages, attorneys' fees, and costs to be determined at trial;

2. For the Second Cause of Action, compensatory damages, attorneys' fees, and costs to be determined at trial;

3. For the Third Cause of Action, compensatory damages, attorneys' fees, and costs to be determined at trial;

4. For the Fourth Cause of Action, compensatory damages attorneys' fees and costs to be determined at trial; and

5. For such other and further relief as the Court deems just and proper.

Dated: Dallas, Texas
February 17, 2022

By: _____
Walker G. Harman, Jr. [WH-8044]
THE HARMAN FIRM, LLP.
*Attorney for Plaintiff*
244 Fifth Ave., Suite H211
New York, New York 10001
(646) 248-2288
wharman@theharmanfirm.com