UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **PAUL CRAIG WORRALL,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 3:22-CV-0392-B** |
| | § | |
| **RIVER SHACK LLC d/b/a WOODSHED SMOKEHOUSE and LOVE STYLE, INC.,** | § | |
| | § | |
| | § | |
| | § | |
| **Defendants.** | § | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is Defendants River Shack LLC d/b/a Woodshed Smokehouse and Love Style, Inc. (collectively, "River Shack")'s Motion to Dismiss Plaintiff Paul Craig Worrall's ("Mr. Worrall") First Amended Complaint (Doc 22, Mot. Dismiss, *see also* Doc. 21, Am. Compl.). Because Mr. Worrall has not sufficiently pleaded the elements of his associational disability discrimination claim, the Court **GRANTS** River Shack's Motion (Doc. 22).

**I.**

**BACKGROUND**[1]

This is an employment discrimination case. Mr. Worrall worked as a restaurant manager for River Shack from September 9, 2020, to March 14, 2021. Doc. 21, Am. Compl., ¶¶ 9, 51–52. On March 14, 2021, River Shack terminated Mr. Worrall for falsification of documents following three inconsistent COVID-19 ("COVID") tests. *Id.* ¶¶ 48, 51–52. Mr. Worrall claims

[1] The Court draws the following factual account from Plaintiff's Amended Complaint (Doc. 21).

he was terminated because of his association with his allegedly disabled wife ("Ms. Worrall"), not his inconsistent COVID test results, and thus brought this suit against River Shack. *Id.* ¶ 69.

Ms. Worrall's illness began in January, and for the last three weeks of January 2021, Ms. Worrall was confined to her bed. *Id.* ¶¶ 11–25. She began taking "a number of medications" due to her low oxygen levels and experienced profuse coughing. *Id.* ¶ 15. On January 22, Mr. Worrall "received a text message from Human Resources ('HR') agent Melinda Morgan asking how [] Worrall's wife was doing as she had heard . . . Worrall's wife had been exposed to COVID." *Id.* ¶ 10. Morgan also circulated an email regarding positive COVID tests, stating those who tested positive and isolated themselves at home would not receive pay. *Id.* ¶ 26. Nevertheless, Mr. Worrall "continued to update his employer about [Ms. Worrall's] status, including that she was COVID negative" during this time. *Id.* ¶ 17. While Mr. Worrall did not miss work because of Ms. Worrall's illness, Mr. Worrall's January paycheck included COVID sick pay. *Id.* ¶¶ 28, 32–33.

In February, Ms. Worrall tested negative for COVID, but her symptoms persisted. *Id.* ¶¶ 16, 18. Ms. Worrall's doctor remained concerned about possible fluid build-up in her lungs and her general health during this time. *Id.* ¶ 19. Ms. Worrall was "incapable of performing major life activities during her illness," and their daughters would check on her while Mr. Worrall was at work. *Id.* ¶ 20. "Specifically, Ms. Worrall, during this time, rarely left her bed. She was incapable of making herself food, of feeding herself, of going to the store, [of] providing herself with medical care, of returning to work in any capacity and…[and] of bath[ing] herself." *Id.* ¶ 21. Mr. Worrall continued to communicate to River Shack that Ms. Worrall was very ill, and he was acting as her caretaker. *Id.* ¶ 31. And he continued to notify River Shack that Ms. Worrall was being tested for COVID and the tests were negative. *Id.* ¶ 17. However, Mr. Worrall did not disclose

that he worried Ms. Worrall would not survive her illness as he feared River Shack's response. *Id.* ¶¶ 22–23.

Around March 1, 2021, Ms. Worrall tested positive for COVID. *Id.* ¶ 36. A few days later, Mr. Worrall also tested positive for COVID. *Id.* ¶¶ 35, 38. On March 4, a River Shack employee, the same who later informed Mr. Worrall of his termination, told Mr. Worrall that while he was not at work, the most he could be paid was "50% of 90% of [his] wage." *Id.* ¶¶ 40, 51–52. The following day, after Mr. Worrall inquired about River Shack's post-COVID return policy, River Shack HR confirmed he could return to work with full pay if he produced a negative COVID test. *Id.* ¶¶ 41–42. That same day, Mr. Worrall took a second test, tested negative, and returned to work on March 6, 2021. *Id.* ¶¶ 42–43. On March 10, HR and the Chief Operating Officer requested Mr. Worrall take a third test which he then took. *Id.* ¶¶ 44–46. This test came back positive, and Mr. Worrall was instructed to isolate for fourteen days. *Id.* ¶¶ 46, 49. On March 14, River Shack terminated Mr. Worrall for "falsification of documents." *Id.* ¶¶ 51–52. Mr. Worrall, however, asserts his COVID tests were "administered and signed by an attending physician or official" and claims that the "falsification of documents" explanation was simply a "pretext to discriminate against him on the basis of disability." *Id.* ¶¶ 50, 52, 58.

Mr. Worrall filed his original complaint on February 17, 2022, alleging (1) disability discrimination under the Americans with Disabilities Act ("ADA"); (2) disability discrimination under Chapter 21 of the Texas Labor Code or the Texas Commission of Human Rights Act ("TCHRA"); (3) associational discrimination under the ADA; and (4) associational discrimination under the TCHRA. Doc. 1, Compl., ¶¶ 1–4. River Shack filed a motion to dismiss all claims under Federal Rule of Civil Procedure 12(b)(6) on May 2, 2022. Doc. 6, Mot. Dismiss, 1. The Court granted River Shack's Motion to Dismiss on August 15, 2022. Doc. 20, Mem. Op.

& Order, 12. The Court found Mr. Worrall had not sufficiently pleaded facts to raise an inference he was disabled or regarded as disabled, nor had he pleaded facts to raise an inference Ms. Worrall was disabled. *Id*. at 7, 9, 11. However, Mr. Worrall was granted leave to amend his complaint. *Id.* at 12.

Worrall filed his amended complaint on September 6, 2022, and he alleges only an associational disability claim under the ADA. Doc. 21, Am. Compl., ¶ 1. River Shack filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) on Sept. 20, 2022. Doc. 22, Mot. Dismiss, 1. The Court considers it below.

## II.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Rule 12(b)(6)[2] authorizes a court to dismiss a plaintiff's complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In considering a Rule 12(b)(6) motion to dismiss, "[t]he court accepts all well-pleaded facts as true, viewing them in the light most favorable to

[2] The Court's review under Rule 12(b)(6) is limited to a plaintiff's allegations in the complaint and to those documents attached to a defendant's motion to dismiss that are referred to in the complaint and are central to the plaintiff's claims. *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004). Otherwise, "the motion to dismiss must be treated as a motion for summary judgment under Rule 56(c)." *Id.* Mr. Worrall argues River Shack's motion to dismiss should be converted to a motion for summary judgment, contending River Shack relies on EEOC guidelines as evidence. *See* Doc. 24, Resp., 4. Mr. Worrall also requests conversion to summary based on River Shack's claim that "the evidence in the record is insufficient to support essential elements of the Plaintiff's claim." *See id.* Mr. Worrall argues this claim goes to factual disputes outside the pleadings. *See id.* The Court disagrees. The EEOC guidelines, as discussed in both the Court's prior order and in this opinion, are persuasive authority used to determine disability, not evidence. *See* Doc. 20, Mem. Op. & Order, 7. Further, River Shack only argues that Mr. Worrall's claim should fail under prevailing 12(b)(6) standards and does not request the Court consider disputes in the factual record. *See* Doc. 22, Mot. Dismiss, 1–2. Thus, the Court does not see a valid basis for converting the motion to dismiss into a motion for summary judgement.

the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (internal quotations omitted). But, "th[e] court will not look beyond the face of the pleadings to determine whether relief should be granted based on the alleged facts." *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999).

To survive a motion to dismiss, plaintiffs must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). When well-pleaded facts fail to meet this standard, "the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 679 (quotations and alteration omitted).

## III.
## ANALYSIS

Mr. Worrall now only alleges an associational discrimination claim. He claims River Shack terminated his employment because Ms. Worrall was disabled. Doc. 21, Am. Compl., ¶¶ 65, 67–68. He believes the grounds of his termination, falsification of documents, were merely discriminatory pretext. *Id.* River Shack argues Mr. Worrall has failed to allege facts giving rise to an inference that his wife was considered disabled. Doc. 23, Br. Supp. Mot. Dismiss, 5. River Shack also argues that even if Mr. Worrall has sufficiently alleged Ms. Worrall was disabled, he has not alleged sufficient facts to show River Shack knew of Ms. Worrall's disability or sufficiently

pleaded a connection between his termination and her disability. *Id.* at 2.

The ADA prohibits discrimination against a qualified individual on the basis of disability. 42 U.S.C. § 12112(a). The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). And the term "disability" is construed broadly to ensure coverage in accordance with the statute. *Id.* § 12102(4)(A).

Under the ADA, individuals are substantially limited if they are "unable to perform a major life activity that the average person in the general population can perform, or [are] significantly restricted in the ability to perform it." *EEOC v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 614 (5th Cir. 2009) (citing 29 C.F.R § 1630.2(j)). "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

The ADA also prohibits discrimination against a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association. 42 U.S.C. § 12112(b)(4). While the Fifth Circuit has not "explicitly recognized a cause of action for discrimination based on association with a handicapped individual," it has noted a test cited by courts within this district. *See Grimes v. Wal-Mart Stores Tex., L.L.C.*, 505 F. App'x 376, 380, n.1 (5th Cir. 2013) (explaining the test used by district courts within the circuit without officially recognizing a cause of action for associational discrimination because the plaintiff in the case could not meet the burden even assuming viability of an associational discrimination cause of action); *Moresi v. AMR Corp.*, 1999 WL 680210, at *2–3

(N.D. Tex. Aug. 31, 1999) (Buchmeyer, C.J.).[3] The Court assumes without deciding such a claim is valid.

To make a prima facie case for associational discrimination, a plaintiff must show: (1) his qualification for the job; (2) an adverse employment action; (3) the employer's knowledge of the employee's disabled relative; (4) and that the adverse employment action occurred under circumstances raising a reasonable inference that the relative's disability was a determining factor in the employer's adverse action. *Grimes*, 505 F. App'x at 380.

As a threshold matter, the Court addresses whether Mr. Worrall plausibly alleged facts showing Ms. Worrall's COVID illness constituted a disability under the ADA. The Court then addresses whether Mr. Worrall sufficiently pleaded River Shack knew of Ms. Worrall's alleged disability, and that disability played a part in his termination. Ultimately, the Court finds Mr. Worrall raised the inference Ms. Worrall was disabled under the ADA, but he has not pleaded sufficiently that River Shack knew of her disability or that her disability played a part in his termination. Thus, River Shack's Motion to Dismiss is **GRANTED**.

A. *Mr. Worrall Alleges a Plausible Disability Under the ADA*

The Court first addresses Mr. Worrall's claim that Ms. Worrall's battle with COVID constituted a disability under the ADA. River Shack argues that Mr. Worrall fails to plead sufficient facts showing Ms. Worrall's symptoms impeded any of her major life activities to qualify her as disabled. *See* Doc. 22, Mot. Dismiss, 1. Mr. Worrall, however, claims Ms. Worrall's COVID symptoms were extensive and severely limited her major life activities, and thus met the definition of disability. *See* Doc. 24, Resp., 6–8.

[3] The test laid out in *Moresi* is based on a decision from the Tenth Circuit. *See Den Hartog v. Wasatch Acad.*, 129 F.3d 1076, 1085 (10th Cir. 1997).

A plaintiff's burden when claiming a disability based on COVID is far from settled. However, a plaintiff must at least allege how his specific COVID symptoms impacted major life activities. *See Luedecke v. Tenet Healthcare Corp.*, 2015 WL 58733, at *5 (N. D. Tex. Jan. 5, 2015) (Boyle, J.) (finding plaintiff's general statement that his alleged disability "limit[ed] his major life activity of work as well as non-work related activit[ies]" without further explanation insufficient to allege a disability under the ADA); *see also McCone v. Exela Techs.*, Inc., 2022 WL 801772, at *4 (M.D. Fla. Jan. 14, 2022) ("[B]eing infected with COVID-19, standing alone, does not meet the ADA's definitions of disability or impairment"). *But see Brown v. Roanoke Rehab & Heathcare Ctr.*, 586 F. Supp. 3d 1171, 1177 (M.D. Ala. 2022) (concluding a plaintiff's allegations regarding her COVID symptoms and how they impacted her ability to breathe, concentrate, and work were sufficient to plead a disability at the motion-to-dismiss stage). And allegations regarding a need to isolate or quarantine, without more, do not support an inference of disability. *See Champion v. Mannington Mills, Inc.*, 538 F. Supp. 3d 1344, 1349 (M.D. Ga. May 10, 2021) (finding allegations of an isolation period, devoid of any specific symptoms caused by COVID that demonstrated a major life activity was substantially impaired, did not constitute a disability).

The EEOC guidelines, which courts may find persuasive in determining disability, state that mild symptoms of COVID which resolve within several weeks or asymptomatic cases of COVID do not constitute substantial impairment, regardless of any requirement to isolate during the period of infection. *See* U.S. EEOC, *What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws*, https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws (last updated July 12, 2022) [hereinafter U.S. EEOC, *Guidelines*]; *see also Brown*, 586 F. Supp. 3d at 1176–77. But, "non-minor" COVID symptoms "do not necessarily have to last any particular length of time to be

substantially limiting." U.S. EEOC, *Guidelines*.

Considering the EEOC guidance, the Court finds that Mr. Worrall has sufficiently pleaded a disability under the ADA. Mr. Worrall claims that his wife was unable to feed herself, travel to the store, provide herself with medical care, work, go to the bathroom, or bathe without assistance. Doc. 21, Am. Compl., ¶ 21. These impairments were accompanied with symptoms of low oxygen levels and profuse coughing, along with concern about lung fluid-build up and time spent on bedrest. *Id.* ¶¶ 13, 15, 19. The Amended Complaint identifies specific symptoms and particular activities that her illness inhibited. *See id.* ¶¶ 12, 19–21, 25, 36. Thus, Mr. Worrall has pleaded that Ms. Worrall's major life activities were substantially limited by her symptoms and thus her illness qualifies as a disability. *See Brown*, 586 F. Supp. 3d at 1177; 42 U.S.C. § 12102(2)(A).

River Shack's contention that Ms. Worrall's symptoms were "similar to those of the common cold or flu that resolve in a matter of weeks—with no other consequences" is unavailing. Doc. 23, Br. Supp., 6. The EEOC says "a person whose COVID-19 results in mild symptoms similar to those of the common cold or flu that resolve in a matter of weeks—*with no other consequences*—will not [constitute a] actual disability within the meaning of the ADA." U.S. EEOC, *Guidelines* (emphasis added). However, Mr. Worrall alleges many other consequences of Ms. Worrall's COVID symptoms, such as her inability to care for herself or complete daily tasks. *See* Doc. 21, Am. Compl., ¶¶ 13, 15, 19–21. Thus, her symptoms extend beyond symptoms of the common cold or flu for the purposes of establishing disability.

Further, River Shack's argument that Mr. Worrall's claim fails because Ms. Worrall's COVID symptoms resolved in a matter of weeks is similarly unconvincing. Doc. 23, Br. Supp., 6–7. No minimum time requirement exists for "non-minor" COVID symptoms to be considered

substantially limiting. *See* U.S. EEOC, *Guidelines*. Thus, Mr. Worrall's allegations of Ms. Worrall's non-minor symptoms—including low oxygen levels, coughing, and trouble completing general tasks like feeding and bathing, for example—are not negated because of their short duration. *See* Doc. 21, Am. Compl., ¶¶ 15, 21 (alleging Ms. Worrall's symptoms lasted approximately three months). Because he has pleaded substantial impairment of Ms. Worrall's major life activities due to her various symptoms, the Court finds Mr. Worrall has plausibly alleged Ms. Worrall's disability under the ADA.

*B. Mr. Worrall Does Not Sufficiently Allege Associational Discrimination Under the ADA*

The Court next turns to whether Mr. Worrall has pleaded sufficient facts to show he was terminated because of his association with his allegedly disabled wife. According to River Shack, the pleadings fail to show its knowledge of Ms. Worrall's alleged disability and to connect Mr. Worrall's termination to his association with Ms. Worrall. Doc. 22, Mot. Dismiss, 1–2. Mr. Worrall argues River Shack knew of Ms. Worrall's COVID disability and relied on Mr. Worrall's alleged "falsification of documents" as a pretext for terminating him. Doc. 21, Am. Compl., ¶¶ 65, 67–69. Upon review, the Court agrees with River Shack.

First, Mr. Worrall has not sufficiently alleged River Shack knew of Ms. Worrall's disability. *See Grimes*, 505 F. App'x at 380. Mr. Worrall's Amended Complaint repeatedly alleges that "Defendants knew about Ms. Worrall's symptoms" and Mr. Worrall "continued to update his employer about [Ms. Worrall's] status." Doc. 21, Am. Compl., ¶¶ 17, 27. However, the Amended Complaint does not state what symptoms and limitations were communicated to River Shack, nor how this information was communicated. Further, Mr. Worrall's failure to disclose the severity of Ms. Worrall's illness to River Shack due to fear of reprisal suggests River Shack was not fully informed of Ms. Worrall's condition. *See id.* ¶¶ 22–23. Thus, Mr. Worrall's

threadbare allegations of knowledge do not raise a reasonable inference that River Shack knew of Ms. Worrall's disability. *See Iqbal*, 556 U.S. at 678.

Even if Mr. Worrall could sufficiently allege River Shack knew of Ms. Worrall's disability, he has not alleged a plausible connection between her disability and his firing. *See Grimes*, 505 F. App'x at 380. Associational disability has been infrequently litigated in this Circuit, but a survey of the other circuits provides relevant, persuasive authority to evaluate this element of Mr. Worrall's claim. For example, the Eighth Circuit has noted that "close temporal proximity between an employer's discovery of a protected characteristic and an adverse employment action" can create an inference of discrimination. *Strate v. Midwest Bankcentre, Inc.*, 398 F.3d 1011, 1020 (8th Cir. 2005) (utilizing the concept of temporal proximity in the context of retaliation).

The Seventh Circuit uses their own modified test, allowing:

> a plaintiff, without direct evidence of discrimination, [to] prove her case by establishing that: (1) she was qualified for the job at the time of the adverse employment action; (2) she was subjected to an adverse employment action; (3) she was known by her employer at the time to have a relative or associate with a disability; and (4) her case falls into one of the three relevant categories of expense, distraction, or association.

*Dewitt v. Proctor Hosp.*, 517 F.3d 944, 948 (7th Cir. 2008) (citing *Larimer v. Int'l Bus. Machines Corp.*, 370 F.3d 698, 701–02 (7th Cir. 2004)). The first category, expense, involves an adverse employment action motivated by the cost or potential cost of the disabled individual to the employer's health plan. *Larimer*, 370 F.3d at 700. The second category, distraction, involves an employer's fear that an employee will become inattentive at work due to the disabled individual. *Id.* The third category, disability by association, involves an adverse employment action based on an employer's fear the employee will become afflicted by the disability. *See id.* (using an

employee's sexual partner's HIV diagnosis as an example).

The Court finds these cases persuasive in determining whether Mr. Worrall has alleged a plausible connection. None of the categories articulated by the Seventh Circuit are applicable. Expense has no bearing on this case because Mr. Worrall has not alleged any facts relating to the cost of Ms. Worrall's illness and its effect on River Shack. *See id.* And while COVID is a communicable illness, River Shack had already implemented a return policy for individuals who tested positive, which dictated when affected employees could return to work. *See id.;* Doc 21, Am. Compl., ¶¶ 41–42.

As to distraction, Mr. Worrall alleges facts implying Ms. Worrall's illness was serious and causing him emotional distress, but it is unclear from his Complaint if it affected his work at River Shack or that River Shack feared the potential effect. *See* Doc. 21, Am. Compl., ¶¶ 20–23, 33 (alleging Mr. Worrall never missed work to care for his wife). And despite his "fear that his wife may not survive the illness," Mr. Worrall did not disclose that fear, worked without incident until March 1, and only missed work when he tested positive for COVID. *Id.* ¶¶ 22–23, 33–34, 38, 43, 49. Finally, Mr. Worrall was not terminated until March, after his inconsistent COVID tests. *Id.* ¶ 52. Given River Shack knew of Ms. Worrall's illness as early as January, Mr. Worrall has alleged no facts to support a temporal proximity argument. *Cf. Magnus v. St. Mark United Methodist Church*, 2010 WL 4177614, at *1, *5 (N.D. Ill. Oct. 19, 2010) (finding an employee who reported late to work once on account of her disabled daughter and was terminated the next morning raised the reasonable inference she was terminated based on her association with her daughter).

In sum, Mr. Worrall has not alleged sufficient facts to show River Shack knew of Ms. Worrall's alleged COVID disability and terminated Mr. Worrall because of it. *See Grimes*, 505 F.

App'x at 380; *see also Iqbal*, 556 U.S. at 678. Thus, the Court **GRANTS** River Shack's motion to dismiss the associational disability claim.

C. *Mr. Worrall May Amend His Pleadings*

Mr. Worrall does not request leave to amend his pleadings in response to River Shack's motion to dismiss. However, under the Federal Rules of Civil Procedure, the Court should freely give leave to amend when justice so requires. Fed. R. Civ. P. 15(a)(2). The decision to allow amendment of a party's pleadings is within the sound discretion of the district court. *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Norman v. Apache Corp.*, 19 F.3d 1017, 1021 (5th Cir. 1994).

In determining whether to allow such amendment, a court considers the following: "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment." *Foman*, 371 U.S. at 182; *Schiller v. Physicians Res. Grp. Inc.*, 342 F.3d 563, 566 (5th Cir. 2003) (citation omitted).

The Court gives Mr. Worrall one opportunity to replead his associational discrimination claim, as the Court's previous order did not reach the deficient elements of Mr. Worrall's associational discrimination claim. Accordingly, the Court **GRANTS LEAVE** for Mr. Worrall to file an amended complaint.

## IV.

## CONCLUSION

Because Mr. Worrall has not sufficiently alleged River Shack knew of Ms. Worrall's disability or shown a connection between Ms. Worrall's disability and his firing to establish an associational disability discrimination claim, the Court **GRANTS** River Shack's Motion to Dismiss

(Doc. 22). This case is hereby **DISMISSED WITHOUT PREJUDICE**. If Mr. Worrall wishes to file an amended complaint, he must do so within **THIRTY (30) days** of this Order.

**SO ORDERED.**

**SIGNED: March 22, 2023.**

**JANE J. BOYLE**
**UNITED STATES DISTRICT JUDGE**