**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
------------------------------------------------------------------------X
PAUL CRAIG WORRALL,

                            *Plaintiff*,                            **SECOND AMENDED**
                                                                                          **COMPLAINT**
      -against-

RIVER SHACK LLC d/b/a WOODSHED                       **3:22-cv-392**
SMOKEHOUSE and LOVE STYLE, INC.
                                                                              **JURY REQUESTED**

                            *Defendants*.
------------------------------------------------------------------------X

       Plaintiff Paul Craig Worrall ("Plaintiff" or "Mr. Worrall"), by his counsel, The Harman Firm, LLP, alleges for his Complaint against Defendants River Shack d/b/a Woodshed Smokehouse (herein referred to as "River Shack") and Love Style, Inc. (collectively, "Defendants"), as follows:

## NATURE OF THE ACTION

       1.     Plaintiff seeks damages and costs against Defendants for discriminating against him on the grounds that he was associated with someone who was disabled, and/or would have been a caregiver, within the confines of the Americans with Disabilities Act ("ADA"). 42 U.S.C. Sec. 12101 *et seq.*

## PARTIES

       2.     At all times relevant hereto, Plaintiff was and is a resident of Dallas County in the State of Texas.

       3.     Upon information and belief, at all times relevant hereto, Defendant River Shack was and is an incorporated company organized under the laws of the State of Texas with its principal place of business at 3201 Riverfront Drive, Fort Worth, Texas.

4. Upon information and belief, at all times relevant hereto, Defendant Love Style's headquarters is located at 713 N Main St, Fort Worth, Texas 76164, and it is organized under the laws of the State of Texas.

## ADMINISTRATIVE PREREQUISITE

5. Plaintiff received a Right to Sue letter from the Equal Employment Opportunity Commission on January 6, 2022 and filed this action within the ninety (90) day period.

## JURISDICTION

6. Pursuant to 28 U.S.C. § 1331, this Court has original jurisdiction over Plaintiff's claims, as they arise under the ADA, 42 U.S.C. § 12101, *et seq*.

## JURY TRIAL REQUESTED

7. Plaintiff respectfully requests a trial by jury.

## STATEMENT OF FACTS

8. In 2020, Director of Operations, Bill Curcie, recruited Mr. Worrall to work at River Shack.

9. Mr. Curcie eventually hired Mr. Worrall at River Shack on September 9, 2020 as a Restaurant Manager.

10. On January 22, 2021, Mr. Worrall received a text message from Human Resources agent Melinda Morgan asking how Mr. Worrall's wife was doing as she had heard from Terry Ward, Chief Operating Officer, that Mr. Worrall's wife had been exposed to COVID.

11. Ms. Worrall had been sick for some time.

12. For the last three weeks of January 2021, Ms. Worrall was confined to her bed.

13. At first, the Worrall's were unsure of the cause, and they both agreed to have Ms. Worrall stay at home, in bed, everyday all day, to see if she could recover.

14. At this time, many were afraid to go to hospitals given that Covid-19 was rampant, especially in Texas.

15. Ms. Worrall, in January, was beginning to take a number of medications, her oxygen levels were low, and she was coughing profusely.

16. In February 2021, Ms. Worrall was tested for COVID, but the test came back negative.

17. Mr. Worrall continued to update his employer about her status, including that she was COVID negative.

18. Ms. Worrall did not recover during this time, and eventually was tested for COVID again in March when she tested positive.

19. All during this time, the Worrall's doctor was concerned about Ms. Worrall's health and possible fluid build-up in her lungs.

20. Ms. Worrall was incapable of performing major life activities during her illness, and their daughters frequently had to check on her while Mr. Worrall was at work.

21. Specifically, Ms. Worrall, during this time, rarely left her bed.  She was incapable of making herself food, of feeding herself, of going to the store, providing herself with medical care, of returning to work in any capacity, and needed assistance going to the bathroom or to bathe herself.

22. In fact, there were a number of times Mr. Worrall was overcome with the fear that his wife may not survive the illness.

23. Mr. Worrall did communicate that his wife was very ill to River Shack senior employees.

24. Ms. Worrall would eventually recover, but the months of January through March 2021 were very touch-and-go as Ms. Worrall seemed on the brink of death at times.

25. Ms. Worrall's breathing was very shallow, and because of restrictions on admitting patients to hospitals amidst a COVID surge, Mr. Worrall was unsure whether Ms. Worrall would be able to receive treatment should her condition worsen.

26. Despite knowing the severity of Ms. Worrall's condition, Ms. Morgan sent out an email on January 22, 2021 to staff, including Mr. Worrall, stating that anyone who tests positive for COVID and isolates themselves at home, would not receive pay.

27. Neither Mr. Worrall nor his wife had tested positive for COVID, but Defendants knew about Ms. Worrall's symptoms which had begun in early January 2021 and Mr. Worrall had notified them during that time.

28. In spite of the fact that Mr. Worrall had not tested positive for COVID, COVID sick pay was applied to his paycheck in January of 2021.  Mr. Worrall did not receive time off from work in January 2021, when Defendants applied COVID sick pay to his paycheck.

29. Upon information and belief, River Shack sent the email threatening loss of pay knowing that Mr. Worrall may have to take time off work to operate as a caregiver within the confines of the ADA.

30. Mr. Worrall had not, during this period, tested positive nor had he notified River Shack that he had tested positive for COVID.

31. Mr. Worrall had communicated that his wife was very ill, through January and February, and was being tested for COVID, explaining that he may have to act as a caregiver, but she was not COVID positive until March 2021.

32. On January 23, 2021, the day after the email, Mr. Worrall notified Ms. Morgan of his wife's negative test result and that he, therefore, had no need to test as well.

33. Ms. Morgan asked Mr. Worrall if he had missed any time from work during this process; Mr. Worrall denied that he had missed any work, as this had all taken place during his days off.

34. Mr. Worrall continued to work without incident until March 1, 2021, when Mr. Worrall informed Mr. Heisler that his family doctor wanted his wife to be tested again as he believed she had contracted COVID.

35. Mr. Heisler suggested Mr. Worrall get tested as well; Mr. Worrall agreed.

36. On or about March 1, 2021, Mr. Worrall learned that his wife was COVID positive. Mr. Worrall's wife was very ill with COVID symptoms and he had to stay home to care for her.

37. Mr. Worrall learned this while at a job fair event at Ático Fort Worth, a restaurant owned by Tim Love inside a hotel.

38. Mr. Worrall was with Chris Heisler, Director of Love Style, Inc., and Mr. Ward when he learned about his wife's positive test.

39. He told Mr. Heisler and Mr. Ward that "Terry was real bad" and described her ailments and, specifically, that her doctors were concerned about fluid buildup in her lungs.

40. Ms. Worrall would eventually be diagnosed with pneumonia.

41. Mr. Heisler texted Mr. Worrall, on March 2, 2021 "How is your wife feeling?"

42. Mr. Worrall responded "Not great, but better than yesterday. Still weak and feels like crap."

43. Ms. Heisler only responded "Take care of her."

44. Defendants never made any attempt to engage in the interactive process with Mr. Worrall regarding his possible or his wife's actual disability despite the fact that Defendants were aware of Ms. Worrall's disability.

45. Mr. Heisler went on to text Mr. Worrall the next day, saying "Please send me your managers schedule for the next three weeks."

46. That same day, March 3, Mr. Worrall asked Mr. Heisler to call him, as he also tested positive for COVID. The test and result came from the CVS Pharmacy (hereinafter "CVS").

47. Mr. Heisler told Mr. Worrall, now over the phone, that he was going "to bat" for Mr. Worrall to help him get paid for his now imminent sick leave.

48. The next day, March 4, Mr. Heisler called Mr. Worrall and said that the best he could do was 50% of 90% of Mr. Worrall's wage.[1]

49. On March 5, 2021, Mr. Worrall texted Ms. Morgan seeking clarification for River Shack's return policy, and inquired if he produced a negative test so that he would be cleared for a return to work, with full pay.

50. Ms. Morgan replied "yes," and, that same day, Mr. Worrall went to get tested again, this time at the Premier Wellness Clinic (hereinafter "Premier") and tested negative for COVID.

51. Mr. Worrall notified Mr. Heisler almost immediately that he would be back for work the next day. Mr. Worrall proceeded to work from March 6, 2021 through March 10, 2021 without incident.

52. On March 10, 2021, Mr. Worrall was notified by Mr. Heisler that he was needed in a meeting with Ms. Morgan and Mr. Ward.

---

[1] Mr. Worrall has waived his right to receive his two weeks compensation for that sick pay, *see* Worrall, et al. v. Love, et al., 3:21-cv-02602-D, but did not waive his right to receive other damages available under the ADA, such as other lost pay, emotional distress, and attorney's fees, amongst other remedies the Court deems just and proper.

53. Ms. Morgan and Mr. Ward requested that Mr. Worrall go to a CVS and get tested for a third time. Mr. Worrall proceeded to do so.

54. On March 11, 2021, around 11:00am, Mr. Worrall was tested for COVID at the Carrollton CVS. After receiving the March 11 test results from CVS on March 13, Mr. Worrall notified Mr. Heisler that he received a positive test.

55. Mr. Heisler responded "understood."

56. In all, Mr. Worrall had three relevant COVID tests; March 1, positive; March 5, negative; and March 11, positive.

57. Following his positive March 11 test, Mr. Worrall began to feel the effects of COVID-19, such as a lack of energy to perform daily tasks, and was instructed to not leave his home for fourteen (14) days.

58. For all three tests Mr. Worrall has evidence that the test was administered and signed by an attending physician or official.

59. The following morning, March 14, 2021, Mr. Heisler inquired about Mr. Worrall's wellbeing via phone call.

60. On that same call, Mr. Heisler notified Mr. Worrall of his termination from River Shack for "falsification of documents." Mr. Worrall never received anything in writing regarding his termination from River Shack.

61. Mr. Worrall then went to Premier to verify that Premier indeed had records of his test administered at that site. The clerk verified Mr. Worrall was tested at that clinic on March 5, 2021. Mr. Worrall asked the clerk to take photos of the records confirming his visit at Premier and had the clerk send those records to him.

62. Mr. Worrall had not falsified any document.

7

63. Rather, the tests failure to either render an accurate reading, or a coincidence of contracting COVID after March 5, 2021, but before March 11, 2021, led to a discrepancy in the tests results.

64. In either scenario, Mr. Worrall did not falsify any record of his COVID tests.

65. Mr. Worrall has a copy of the March 5, 2021 test which clearly notes that his status was "negative" and was signed by the Premier staff member on site.

66. Mr. Worrall did not falsify any documents, but, rather, River Shack chose to unjustly claim that Mr. Worrall lied about the test result as pretext to discriminate against him on the basis of disability.

67. Mr. Heisler knew that Ms. Worrall had been very ill and that Mr. Worrall's association with her would be a strain on his ability to work.

68. Mr. Heisler likely suspected that Mr. Worrall received COVID-19 from his wife and would, therefore, have the same systems, but also that her ailments, which were persisting alongside a pneumonia diagnosis, would continue to restrict Mr. Worrall's ability to work.

69. Defendants were unwilling to give Mr. Worrall paid time away from work, even though Defendants had already claimed to the federal government that Mr. Worrall had received COVID sick pay.  In other words, Defendants were unwilling to reasonably accommodate Mr. Worrall when they denied him paid time away from work.

70. River Shack terminated Mr. Worrall on March 14, 2021 for a pretextual reason and that pretextual termination directly led to Mr. Worrall being unable to claim unemployment benefits.

## CLAIMS

### FIRST CLAIM
### Associational Discrimination in Violation of the Americans with Disabilities Act

71. Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 70 with the same force as though separately alleged herein.

72. The Americans Disabilities Act states that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to … discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. Sec. 12112(a).

73. The ADA specifically notes that it prohibits employers from discriminating against employees who are in a relationship, or otherwise associated, with someone who is disabled. 42 U.S.C. Sec. 12112(b)(4).

74. Defendants threatened to withhold Plaintiff's income if his wife tested positive for COVID.

75. Defendants were aware that Plaintiff's wife was ill for months and was not recovering.

76. Defendants could have reasonably accommodated Plaintiff by giving him sick pay and time off and, thus, would not have subjected to the discrimination he faced in his caregiver status and association with a disabled person.

77. Plaintiff had a negative employment action occur "on the basis of disability" because of his association to a sick family member, his wife.

78. Defendants' stated reason for termination is merely pretext and was shown to be untrue.

79. Plaintiff here meets the Fifth Circuits elements of a prima facie case for association discrimination; he was qualified for his job, he had an adverse employment action occur, the employer clearly and explicitly knew of the disabled relative, and the adverse employment action can be reasonably inferred to have occurred on the basis of that disability. *Grimes v. Wal-mart Stores Texas*, L.L.C., 505 Fed. Appx. 376, 380 (5th Circ. 2014).

80. As a direct and proximate consequence of Defendants' illegal termination, Plaintiff has suffered and continues to suffer, substantial economic and non-economic damages, including but not limited to, back pay, front pay, emotional distress and suffering, all in amounts to be determined at trial.

## **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests the following relief:

1. For the First Cause of Action, compensatory and punitive damages, attorneys' fees, litigation expenses, and costs to be determined at trial; and

2. For such other and further relief as the Court deems just and proper.


Dated: Dallas, Texas
       April 21, 2023

By: _____
Walker G. Harman, Jr. [WH-8044]
THE HARMAN FIRM, LLP.
*Attorney for Plaintiff*
1270 Sixth Ave., Suite 756
New York, New York 10020
(646) 248-2288
wharman@theharmanfirm.com