UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| PAUL CRAIG WORRALL, § | |
| § | |
| Plaintiff, § | |
| § | |
| v. § | CIVIL ACTION NO. 3:22-CV-0392-B |
| § | |
| RIVER SHACK LLC d/b/a WOODSHED § | |
| SMOKEHOUSE and LOVE STYLE, § | |
| INC., § | |
| § | |
| Defendants. § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendants River Shack LLC d/b/a Woodshed Smokehouse and Love Style, Inc. (collectively, "River Shack")'s Motion to Dismiss Plaintiff Paul Craig Worrall ("Mr. Worrall")'s Second Amended Complaint (Doc. 28). For the reasons stated below, the Court **GRANTS** River Shack's Motion and **DISMISSES WITH PREJUDICE** the Second Amended Complaint.

## I.
## BACKGROUND[1]

This is an employment discrimination case. Mr. Worrall worked as a restaurant manager for River Shack from September 9, 2020, to March 14, 2021. Doc. 27, Second Am. Compl., ¶¶ 9, 59–60. On March 14, 2021, River Shack terminated Mr. Worrall for falsification of documents following inconsistent COVID-19 ("COVID") tests. *Id.* ¶¶ 56, 59–60. However, Mr. Worrall claims that the asserted reason for his termination was pretextual. *Id.* 70. In Mr. Worrall's view,

---

[1] The Court draws the following factual account from Plaintiff's Second Amended Complaint (Doc. 27).

the real reason River Shack terminated his employment stems from Mr. Worrall's association with his disabled wife ("Ms. Worrall"). *Id.* ¶¶ 67–68.

Ms. Worrall began feeling ill in January 2021. *Id.* ¶¶ 11–12. At that time, Ms. Worrall allegedly was suffering from low oxygen levels and experienced profuse coughing, and she ultimately began taking "a number of medications" to combat these symptoms. *Id.* ¶ 15.

On January 22, 2021, Melinda Morgan, a Human Resources agent for River Shack, reached out to Mr. Worrall, "asking how [Ms. Worrall] was doing as she had heard . . . Mr. Worrall's wife had been exposed to COVID." *Id.* ¶ 10. The following day, Mr. Worrall responded to Morgan, explaining that his wife tested negative for COVID. *Id.* ¶ 32 Around the same time, Morgan also circulated an email to River Shack employees, including Mr. Worrall, which stated that those who tested positive for COVID and isolated themselves at home would not receive pay. *Id.* ¶ 26. Mr. Worrall's January paycheck included deductions for COVID absences; however, he did not test positive for COVID during this time or "miss[] any work." *Id.* ¶¶ 28, 32–33.

Ms. Worrall continued to test negative for COVID into February 2021, but her symptoms persisted. *Id.* ¶¶ 16, 18. Ms. Worrall's doctor was concerned about "possible fluid build-up in her lungs" and her general health during this time. *Id.* ¶ 19. Eventually, Ms. Worrall became "incapable of performing major life activities." *Id.* ¶ 20. Ms. Worrall was confined to her bed and "incapable of making herself food, of feeding herself, of going to the store, [of] providing herself with medical care, of returning to work in any capacity and . . . [of] bath[ing] herself." *Id.* ¶ 21. Mr. Worrall told River Shack that "his wife was very ill" and that he may have to act as her caretaker. *Id.* ¶¶ 23, 31.

Around March 1, 2021, Mr. Worrall was with Terry Ward, Chief Operating Officer,[2] and Chris Heisler, Director of Defendant Love Style, at a job fair in Fort Worth. *Id.* ¶¶ 37–38. At the job fair, Mr. Worrall learned that his wife tested positive for COVID for the first time. *Id.* ¶¶ 36–37. After learning of his wife's COVID diagnosis, Mr. Worrall "told Mr. Heisler and Mr. Ward that '[Ms. Worrall] was real bad' and described her ailments and, specifically, that her doctors were concerned about fluid buildup in her lungs." *Id.* ¶ 39. On March 2, Mr. Worrall texted Heisler that his wife was feeling "better than yesterday[] [but] [s]till weak and feels like crap." *Id.* ¶¶ 41–42. "Ms. Worrall would eventually be diagnosed with pneumonia." *Id.* ¶ 40.

Shortly thereafter, Mr. Worrall also tested positive for COVID. *Id.* ¶ 46. Mr. Worrall disclosed his COVID diagnosis to River Shack on March 3. *Id.* According to River Shack's policy, while he was away from work, the most Mr. Worrall could be paid was "50% of 90% of [his] wage." *Id.* ¶ 48. On March 5, Mr. Worrall inquired about River Shack's post-COVID return policy, and River Shack explained that he could return to work with full pay if he produced a negative COVID test. *Id.* ¶¶ 49–50. That same day, Mr. Worrall took a second test, which was negative. *Id.* ¶ 50. As a result, Mr. Worrall returned to work on March 6 and continued to work without incident through March 10. *Id.* ¶ 51.

On March 10, Mr. Worrall took a third COVID test at River Shack's direction. *Id.* ¶¶ 52–54. This test came back positive, and Mr. Worrall was instructed to isolate for fourteen days. *Id.* ¶¶ 54, 57. On March 14, River Shack terminated Mr. Worrall for "falsification of documents [i.e, his COVID test]." *Id.* ¶ 60. However, Mr. Worrall asserts the "falsification of documents"

---

[2] The Second Amended Complaint does not indicate whether Mr. Ward was the Chief Operating Officer of Defendant River Shack or Defendant Love Style.

explanation was simply a "pretext to discriminate against him on the basis of disability." *Id.* ¶¶ 60, 66.

Mr. Worrall filed his Second Amended Complaint (Doc. 27) on April 21, 2023, alleging associational discrimination under the Americans with Disabilities Act ("ADA"). River Shack filed the present Motion to Dismiss (Doc. 28) under Rule 12(b)(6) on May 5, 2023. The Court considers it below.

## II.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Rule 12(b)(6)[3] authorizes dismissal of a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). In considering a Rule 12(b)(6) motion to dismiss, "[t]he court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (internal quotations omitted). But "th[e] court will not look beyond the face of the pleadings to determine whether relief should be granted based on the alleged facts." *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999).

To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to

---

[3] The Court's review under Rule 12(b)(6) is limited to a plaintiff's allegations in the complaint and to those documents attached to a defendant's motion to dismiss that are referred to in the complaint and are central to the plaintiff's claims. *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004). Otherwise, "the motion to dismiss must be treated as a motion for summary judgment under Rule 56(c)." *Id.* Mr. Worrall argues River Shack's motion to dismiss should be converted to a motion for summary judgment, contending River Shack "relies on matters outside the pleadings, challenges facts, and asks Plaintiff to litigate on the pleadings." Doc. 30, Resp., 2. The Court disagrees. River Shack argues that Mr. Worrall's claim should fail under prevailing 12(b)(6) standards and does not request the Court consider disputes in the factual record. *See* Doc. 29, Mot. Dismiss, 1–2. Although River Shack references Mr. Worrall's previous complaints, it does so to argue the Second Amended Complaint, like the First Amended Complaint, lacks adequate factual allegations.

relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Rather:

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.

*Id.* (quoting *Twombly*, 550 U.S. at 556). When well-pleaded facts fail to meet this standard, "the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 679 (quotations and alteration omitted).

## III.

## ANALYSIS

Mr. Worrall seeks recovery from River Shack for associational discrimination under the ADA. The ADA prohibits discrimination against "a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." 42 U.S.C. § 12112(b)(4). While the Fifth Circuit has not "explicitly recognized a cause of action for discrimination based on association with a handicapped individual," it has noted a test cited by courts within this district. *See Grimes v. Wal-Mart Stores Tex., L.L.C.*, 505 F. App'x 376, 380 n.1 (5th Cir. 2013); *Moresi v. AMR Corp.*, 1999 WL 680210, at *2–3 (N.D. Tex. Aug. 31, 1999) (Buchmeyer, C.J.). The Court assumes without deciding such a claim is valid.

To state a *prima facie* case for associational discrimination, a plaintiff must demonstrate: (1) his qualification for the job; (2) an adverse employment action; (3) the employer's knowledge of the employee's disabled relative; and (4) that the adverse employment action occurred under circumstances raising a reasonable inference that the relative's disability was a determining factor

in the employer's adverse action. *Grimes*, 505 F. App'x at 380.

River Shack argues that Mr. Worrall has failed to adequately plead the third and fourth elements of his associational discrimination claim: (a) that River Shack knew of Ms. Worrall's disability and (b) that River Shack terminated Mr. Worrall under circumstances giving rise to a reasonable inference that the disability was a determining factor in his termination. The Court agrees with River Shack on both counts.

A.  *Mr. Worrall Failed to Plead River Shack Knew of Ms. Worrall's Disability*

The Court previously held that Mr. Worrall sufficiently alleged that his wife was disabled under the ADA because he pleaded that her condition substantially "limited her major life activities," namely her ability "to feed herself, travel to the store, provide herself with medical care, work, go to the bathroom, or bathe without assistance." Doc. 26, Mem. Op. & Order, 9; *see also* 42 U.S.C. § 1201(1)(A) (defining disability). But, Mr. Worrall's associational discrimination claim depends on a further showing that River Shack knew of this disability. *See Grimes*, 505 F. App'x at 380. Knowledge of a disability for purposes of an associational discrimination claim requires that the employer be aware that a relative's condition substantially interferes with a major life activity. *Schindewolf v. City of Brighton*, No. 14-12161, 2015 WL 3451150, at *8 (E.D. Mich. May 29, 2015).

Mr. Worrall's earlier complaint failed to plead knowledge because he "[did] not state what symptoms and limitations were communicated to River Shack, nor [did he state] how this information was communicated." Doc. 26, Mem. Op. & Order, 10. Stated differently, Mr. Worrall did not allege facts showing that River Shack knew that Ms. Worrall's condition substantially limited her major life activities. *See id.* And if River Shack did not know that Ms. Worrall's condition substantially limited her major life activities, it necessarily could not have known of her

disability. *See* 42 U.S.C. § 1201(1)(A) ("The term 'disability' means . . . a physical or mental impairment that substantially limits one or more major life activities of such individual.").

The foregoing demonstrates that to properly plead knowledge, the Second Amended Complaint must plausibly establish that River Shack was aware of the limitations caused by Ms. Worrall's condition, and which rendered her illness a disability under the ADA. *See* Doc. 26, Mem. Op. & Order, 9–10. At a minimum, this requires allegations that show River Shack knew Ms. Worrall was unable "to feed herself, travel to the store, provide herself with medical care, work, go to the bathroom, or bathe without assistance." *Id.* at 9; *see Schindewolf*, 2015 WL 3451150, at *8.

Mr. Worrall argues that new allegations in the Second Amended Complaint cure his prior pleading deficiencies and reveal River Shack's knowledge of Ms. Worrall's disability. Doc. 30, Resp., 5, 7. Specifically, Mr. Worrall contends that the Second Amended Complaint is sufficient because it includes additional allegations which show that he informed River Shack senior management "that '[Ms. Worrall] was real bad' and [that he] described her ailments and, specifically, that her doctors were concerned about fluid buildup in her lungs." Doc. 27, Second Am. Compl., ¶ 39; *see* Doc. 30, Resp., 5, 7. However, the Court concludes that these allegations[4] fail to demonstrate that River Shack had the requisite knowledge.

---

[4] River Shack asks the Court to "disregard those newly-pleaded factual allegations that contradict those in Plaintiff's prior . . . complaints." Doc. 31, Reply, 5. Specifically, River Shack argues that there is a conflict in Mr. Worrall's First Amended Complaint—which alleged Mr. Worrall "was afraid of what [River Shack] would do if he disclosed [his] fear [that his wife may not survive the illness]"—and the operative Second Amended Complaint—which alleges that "Mr. Worrall did communicate that his wife was very ill to River Shack senior employees." Doc. 21, First Am. Compl. ¶ 23; Doc. 27, Second Am. Compl., ¶ 23. The Court declines to assess whether these allegations are contradictory or whether the latest allegations should be disregarded because in either case, the Second Amended Complaint fails to plausibly demonstrate River Shack's knowledge of Ms. Worrall's alleged disability.

First, that Mr. Worrall told River Shack his wife was "real bad" does not put River Shack on notice that his wife was in fact disabled. This description does not indicate the symptoms that Ms. Worrall was suffering or how these symptoms affected a major life activity. *See Schindewolf*, 2015 WL 3451150, at *8. Nor does the statement "[Ms. Worrall] is real bad" convey that Ms. Worrall was "unable to feed herself, travel to the store, provide herself with medical care, work, go to the bathroom, or bathe without assistance." Doc. 26, Mem. Op. & Order, 9. Second, the allegation that Mr. Worrall "described [his wife's] ailments" is likewise insufficient because it does not identify the specific ailments that Mr. Worrall disclosed to River Shack. *See Ashcroft*, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." (quotations omitted)). Because Mr. Worrall has not pleaded the specific ailments he communicated to River Shack, the Court cannot reasonably infer that River Shack was aware of Ms. Worrall's disability. *See id*.

The allegation that River Shack knew about fluid buildup in Ms. Worrall's lungs presents a more difficult question. Unlike Mr. Worrall's previous complaints, this allegation "state[s] what symptom[] . . . [was] communicated to River Shack, [and] how this information was communicated." Doc. 26, Mem. Op. & Order, 10. Nevertheless, River Shack argues this allegation is insufficient to demonstrate its knowledge because it "does not so much as allege that [Mr. Worrall] communicated any of Ms. Worrall's alleged limitations to River Shack." Doc. 29, Br. Mot. Dismiss, 5 (emphasis omitted). While the Court previously dismissed Mr. Worrall's associational discrimination claim in part because he did not allege that he communicated his wife's limitations to River Shack, *see* Doc. 26, Mem. Op. & Order, 10, communication of a relative's limitations is not an element of an associational discrimination claim. Rather, to state a

claim for relief, Mr. Worrall need only plead River Shack's "*knowledge* of the employee's disabled relative." *Grimes*, 505 F. App'x at 380 (emphasis added). How the employer gains this knowledge—whether communicated directly from the employee to the employer or otherwise—is immaterial to a claim for associational discrimination. *See Moloney v. Home Depot U.S.A., Inc.*, No. 11-10924, 2013 WL 460684, at *2 (E.D. Mich. Feb. 7, 2013). As such, the question is whether River Shack's knowledge of Ms. Worrall's disability can be inferred from its knowledge of a particular symptom.

While a close call, the Court concludes that the allegation that River Shack knew "doctors were concerned about fluid buildup in [Ms. Worrall's] lungs" does not plausibly establish that River Shack had knowledge of Ms. Worrall's disability. The symptom described to River Shack—fluid in the lungs—does not appraise River Shack of the fact that Ms. Worrall was subject to substantial limitations. Fluid buildup in the lungs can be caused by a number of diseases, such as pneumonia,[5] which often does not substantially limit major life activities such as to constitute a disability within the meaning of the ADA. *See, e.g., McKnight v. Renasant Bank*, No. 1:21-CV-00139-GHD-DAS, 2022 WL 1342649, at *5–6 (N.D. Miss. May 3, 2022) (concluding that short-term bout with COVID and pneumonia did not constitute a disability under ADA); *Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 380 (3d Cir. 2002) ("[P]neumonia is a temporary condition and is not protected by the ADA."); *Reis v. Universal City Dev. Partners, Ltd.*, 442 F. Supp. 2d 1238, 1244 (M.D. Fla. 2006) ("[A] temporary condition, such as . . . pneumonia, cannot be the basis of an ADA claim as a matter of law."). Accordingly, the allegation that Mr. Worrall told River Shack that "doctors were concerned about fluid buildup in her lungs" does not plausibly demonstrate

---

[5] *Pulmonary Edema*, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/pulmonary-edema/symptoms-causes/syc-20377009).

that River Shack had knowledge of Ms. Worrall's disability.

In sum, the Second Amended Complaint fails to plead specific facts from which the Court can plausibly infer that River Shack knew Ms. Worrall was disabled. The Second Amended Complaint only generally avers that Mr. Worrall "described [his wife's] aliments" and told River Shack that "his wife was very ill" and "real bad." Doc. 27, Second Am. Compl., ¶¶ 23, 39. However, Mr. Worrall never pleaded that he told River Shack that his wife was disabled or subject to substantial limitations. And the only specific ailment Mr. Worrall alleges he communicated to River Shack was that "doctors were concerned" that his wife had fluid buildup in her lungs. *Id.* ¶ 39. But this ailment is indicative of other conditions that are often not considered a disability. Therefore, taken together and read in conjunction with the other allegations in the Second Amended Complaint, the Court concludes Mr. Worrall has not properly pleaded that River Shack had knowledge of his wife's alleged disability.

B.   *Mr. Worrall Failed to Allege a Plausible Connection Between Disability and Termination*

Even had Mr. Worrall adequately pleaded knowledge, the Second Amended Complaint must still be dismissed because Mr. Worrall has not properly alleged that his wife's disability played a part in his termination.

As explained in a prior Order, because associational discrimination claims under the ADA are rarely litigated in this Circuit, the Court finds persuasive and relies on precedent from the Seventh and Eighth Circuits to determine the fourth element of an associational discrimination claim: whether the "adverse employment action occurred under circumstances raising a reasonable inference that the relative's disability was a determining factor in the employer's adverse action." *Grimes*, 505 F. App'x at 380; *see* Doc. 26, Mem. Op. & Order, 11–12.

The Seventh Circuit finds a plausible connection between a relative's disability and the

adverse employment action if the case "falls into one of the three relevant categories of expense, distraction, or association." *Dewitt v. Proctor Hosp.*, 517 F.3d 944, 948 (7th Cir. 2008) (citing *Larimer v. Int'l Bus. Machines Corp.*, 370 F.3d 698, 701–02 (7th Cir. 2004)); *Van Vliet v. Illinois Dep't of Hum. Servs.*, No. 17 C 3077, 2018 WL 351727, at *9 (N.D. Ill. Jan. 10, 2018). The first category, expense, involves an adverse employment action motivated by the cost or potential cost of the disabled relative to the employer's health plan. *Larimer*, 370 F.3d at 700. The second category, distraction, involves an employer's fear that an employee will become inattentive at work due to the disabled relative. *Id.* The third category, disability by association, involves an adverse employment action based on an employer's fear the employee will also become afflicted by the disability. *See id.* (using an employee's sexual partner's HIV diagnosis as an example).

Courts in the Eighth Circuit look to the temporal proximity between when the employer becomes aware of the disabled relative and the adverse employment action. *See Strate v. Midwest Bankcentre, Inc.*, 398 F.3d 1011, 1020 (8th Cir. 2005) (utilizing the concept of temporal proximity in context of retaliation). However, "temporal proximity alone is generally not enough to make a prima facie case under the ADA unless it is very close." *Malark v. RBC Cap. Markets, LLC*, No. 18-CV-3179, 2020 WL 6064508, at *15 (D. Minn. Oct. 14, 2020).

1. <u>Larimer Categories</u>

As with Mr. Worrall's previous complaint, the Second Amended Complaint has failed to plead facts showing any of the categories articulated by the Seventh Circuit are applicable. The expense category is not applicable in this case because Mr. Worrall has failed to plead facts demonstrating that his wife's disability was costly to River Shack. *See generally* Doc. 27, Second Am. Compl. As the Seventh Circuit explained in *Larimer*, associational discrimination motivated by expense involves a situation when, for example, a relative "has a disability that is costly to the

employer because the spouse is covered by the company's health plan." 370 F.3d at 700. Here, Mr. Worrall has not alleged any facts relating to the cost of Ms. Worrall's illness or its potential effect on River Shack. *See* Doc. 27, Second Am. Compl. As such, the Second Amended Complaint does not plausibly allege that this case falls into the expense category.

The distraction category is likewise inapplicable from the factual allegations in the Second Amended Complaint. The Court previously held that Mr. Worrall failed to allege facts showing that distraction was applicable because he did not plead that his wife's illness "affected his work at River Shack or that River Shack feared the potential effect." Doc. 26, Mem. Op. & Order, 12. The Second Amended Complaint raises two new allegations to address this deficiency. First, Mr. Worrall alleges that River Shack "knew Ms. Worrall had been very ill and that Mr. Worrall's association with her would be a strain on his ability to work." Doc. 27, Second Am. Compl., ¶ 67. Second, Mr. Worrall alleges that River Shack "likely suspected that . . . [Ms. Worrall's] ailments, which were persisting alongside a pneumonia diagnosis, would continue to restrict Mr. Worrall's ability to work." *Id.* ¶ 68. Mr. Worrall's conjecture, however, is not supported by his own allegations.

Mr. Worrall alleges that he worked without incident until March 1, 2021, and that he only missed work when he was diagnosed with COVID. *Id.* ¶¶ 28, 33–34. The Second Amended Complaint does not contain any allegations suggesting that the quality of his work deteriorated or that he otherwise missed work because of his wife's illness prior to his own COVID diagnosis. *See id.*; *see also* Doc. 30, Resp. Mot. Dismiss, 2–3. Thus, there is no basis in the pleadings to support the claim that River Shack thought that Mr. Worrall was distracted by his wife's illness because there are no allegations Mr. Worrall was ever distracted in the first place. *See Larimer*, 370 F.3d at 700 (distraction inapplicable where there "was no evidence that [Plaintiff] was absent

or distracted at work because of his [relative's disabilities]."). Moreover, the Second Amended Complaint fails to plausibly demonstrate that River Shack feared that Mr. Worrall would become distracted at some future point. Doc. 27, Second Am. Compl., ¶ 31. Having been aware that Mr. Worrall's association with his wife was not a strain on his work in the past, it is not plausible to conclude that River Shack believed Ms. Worrall's illness would become a strain on his work in the future absent some material change in her condition. But Mr. Worrall has not pleaded any such change in his wife's status.

Similarly, the claim that River Shack "likely suspected" that Ms. Worrall's disability would "*continue* to restrict Mr. Worrall's ability to work" is in direct conflict with the allegations that Mr. Worrall "worked without incident" and did not miss any work. *Id.* ¶¶ 28, 33–34, 68 (emphasis added). Aside from these conclusory allegations, the Second Amended Complaint does not contain any factual matter from which it could be reasonably inferred that River Shack was concerned that Mr. Worrall would be distracted as a result of Ms. Worrall's illness. *See Heinze v. Tesco Corp.*, 971 F.3d 475, 479 (5th Cir. 2020). As such, the Second Amended Complaint does not plausibly allege that this case falls into the distraction category.

Finally, the Seventh Circuit's disability by association category also does not apply. To plausibly demonstrate that disability by association is applicable, Mr. Worrall must allege facts demonstrating that River Shack was not only worried that Mr. Worrall would contract COVID from his wife, but also that it feared that Mr. Worrall would become disabled as a result of contracting the disease. *See Larimer*, 370 F.3d at 700. The Second Amended Complaint fails in this regard.

Mr. Worrall alleges that River Shack "likely suspected that Mr. Worrall received COVID-19 from his wife and would, therefore, have the same [symptoms as Ms. Worrall]." Doc.

-13-

27, Second Am. Compl., ¶ 68. However, this conclusion is not plausible because there are no allegations that River Shack ever knew Ms. Worrall had COVID. Although Mr. Worrall alleges that he learned of his wife's COVID diagnosis on March 1, he never alleges that he relayed this diagnosis to River Shack. In fact, Mr. Worrall only ever alleges that he repeatedly informed River Shack that his wife tested negative for COVID. *Id.* ¶¶ 16–17, 27, 31–32. Accordingly, it is not plausible to conclude that River Shack thought "Mr. Worrall received COVID-19 from his wife" because there are no allegations that River Shack ever knew Ms. Worrall had COVID in the first place. *Id.* ¶ 68.

Even assuming River Shack knew of Ms. Worrall's COVID diagnosis, the symptoms she experienced during the relevant time frame existed despite having tested negative for COVID on multiple occasions. *Id.* ¶¶ 16, 27, 31–32. Thus, the facts alleged in the Second Amended Complaint suggest that Ms. Worrall's severe symptoms are *unrelated* to her COVID diagnosis. *See id.* ¶¶ 10–12, 16, 18, 24, 27, 31–32. Mr. Worrall fails to explain why, when he tested positive for COVID, River Shack thought he would suffer from the same symptoms as his wife, given that at least some of Ms. Worrall's symptoms do not appear to have been caused by COVID.

Finally, the fact that Mr. Worrall suffered no adverse employment action when he first contracted COVID seriously undercuts the claim River Shack terminated Mr. Worrall because it thought he would become disabled. *See id.* ¶ 46–51. According to the Second Amended Complaint, Mr. Worrall was not terminated the first time he contracted COVID; he was only terminated after he tested negative, returned to work, and tested positive again. *Id.* ¶ 49–60. It is not plausible to conclude that River Shack worried that Mr. Worrall would develop a disability the second time he tested positive for COVID, but not the first time. The Second Amended Complaint, therefore, fails to plead that the disability by association category is applicable.

Accordingly, Mr. Worrall has failed to plead that any of the *Larimer* categories are applicable in this case.

2. Temporal Proximity

Mr. Worrall also argues that the temporal proximity between his conversation with River Shack management on March 1, 2021, at the job fair in Fort Worth and his termination on March 14, 2021, demonstrates that River Shack terminated him because of his association with his wife. Doc. 30, Resp. Mot. Dismiss, 7–8. Specifically, Mr. Worrall argues that when he "revealed his wife was not getting better [on March 1], [River Shack] decided to terminate his employment. . . . rather than deal with someone who would be continuously distracted by caring for a disabled family member." *Id*. at 8. However, Mr. Worrall's temporal proximity argument is unavailing.

In the associational discrimination context, temporal proximity to the adverse employment action is generally measured from the point at which the employer becomes aware of the relative's disability. *See Strate*, 398 F.3d at 1020. While Mr. Worrall has failed to plead that River Shack ever knew of his wife's disability, according to the Second Amended Complaint, Mr. Worrall communicated to River Shack that his wife was sick as early as January. Doc. 27, Second Am. Compl., ¶ 31. Thereafter, Mr. Worrall alleges that he continued to update River Shack on her condition periodically before March 1. *Id*. ¶¶ 31, 34. Mr. Worrall does not allege that his wife's condition on March 1 was worse than the prior updates he had given to River Shack. Thus, it is unclear why March 1 is the relevant date from which to measure temporal proximity. *Cf. Strate*, 398 F.3d at, 1020.

Moreover, Mr. Worrall's actions between March 1 and his termination—namely, his inconsistent COVID tests—weakens Mr. Worrall's temporal proximity argument. *See Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999) (reasoning that intervening misconduct from

employee "eroded" temporal proximity argument). River Shack's asserted justification for firing Mr. Worrall was that he falsified his COVID tests so that he could return to work prematurely (i.e., before he was healthy). Doc. 27., Second Am. Compl., ¶¶ 56, 59. This asserted justification finds support in the allegations. Mr. Worrall first tested positive for COVID on March 3. *Id.* ¶ 46. Two days later, he asked River Shack if he could return to work if he produced a negative COVID test; River Shack said that he could, and Mr. Worrall took a second COVID test that same day, which came back negative. *Id.* ¶¶ 49–50. Mr. Worrall returned to work the next day. *Id.* ¶ 50. Then, on March 10, River Shack instructed Mr. Worrall to take a third COVID test, which came back positive. *Id.* ¶¶ 52–54. As alleged by Mr. Worrall, this series of events—the three inconsistent tests within one week and Mr. Worrall's production of a negative COVID test the same day he asked whether he could return to work if he tested negative—gives credence to River Shack's proffered reason for terminating Mr. Worrall and suggests that this reason was legitimate. While Mr. Worrall admits that he produced three inconsistent tests under these seemingly suspicious circumstances, he baldly asserts that River Shack's asserted justification for terminating him was pretextual, relying principally on a temporal proximity argument. *Id.* ¶ 60. However, in the face of his own apparent misconduct, Mr. Worrall cannot rely on temporal proximity alone to rebut River Shack's purported justification without factual allegations suggesting otherwise. *See Malark*, 2020 WL 6064508, at *15.

Mr. Worrall asserts that he "will have to conduct discovery to ascertain exactly how his association with a disabled person . . . impacted his employment." Doc. 30, Resp. Mot. to Dismiss, 9. However, to be entitled to discovery, Mr. Worrall must first plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 678 (quotations omitted). Having failed to plead factual content that allows

the Court to conclude that River Shack knew of his wife's disability or terminated his employment because of his association with Ms. Worrall, the Court finds that Mr. Worrall has failed to state a claim for associational discrimination under the ADA.

C.      *Mr. Worrall's Associational Discrimination Claim Should be Dismissed with Prejudice*

Mr. Worrall does not request leave to amend his pleadings in response to River Shack's motion to dismiss. However, under the Federal Rules of Civil Procedure, the Court should freely give leave to amend when justice so requires. Fed. R. Civ. P. 15(a)(2). The decision to allow amendment of a party's pleadings is within the sound discretion of the district court. *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Norman v. Apache Corp.*, 19 F.3d 1017, 1021 (5th Cir. 1994).

In determining whether to allow such amendment, a court considers the following: "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment." *Foman*, 371 U.S. at 182; *Schiller v. Physicians Res. Grp. Inc.*, 342 F.3d 563, 566 (5th Cir. 2003) (citation omitted).

The Court has allowed Mr. Worrall to amend his Complaint two times. Mr. Worrall thus has had three chances to state a claim for relief, but he has failed to do so. *See Foman*, 371 U.S. at 182. Because the Court is of the opinion that a fourth opportunity to correct the pleadings would be futile, Mr. Worrall will not be granted leave to amend his complaint.

## IV.

## CONCLUSION

In sum, Mr. Worrall's Second Amended Complaint lacks sufficient factual allegations to demonstrate that River Shack knew of Ms. Worrall's disability or terminated Mr. Worrall because of his wife's disability. *See Grimes*, 505 F. App'x at 380; *see also Ashcroft*, 556 U.S. at 678. Thus,

the Court **GRANTS** River Shack's Motion to Dismiss (Doc. 28). Moreover, because allowing further amendment would be futile, the Court concludes Mr. Worrall should not be granted leave to amend. As such, this case is hereby **DISMISSED WITH PREJUDICE**.

**SO ORDERED.**

**SIGNED: December 5, 2023.**

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE